In re **Estate of**
Isabel Songao **Ayuyu**, Deceased.
Appeal No. 94-032
Civil Action No. 89-863P
August 12, 1996

Submitted on the Briefs May 31, 1996

Counsel for Appellant: Antonio M. Atalig, Saipan.

Counsel for Appellee: Reynaldo O. Yana, Saipan.

31

BEFORE: TAYLOR, Chief Justice, VILLAGOMEZ, Justice, & WHITE, Special Judge

VILLAGOMEZ, Justice:

¶1     ■ This case is before us on appeal for the second time. In the first appeal, we remanded to the Superior Court with instructions to make further findings of fact.[1] The Superior Court made findings and entered a judgment different from its previous judgment. Appellant, Maria Ayuyu Arriola Aguon ("Maria"), now appeals the new judgment distributing a certain parcel of land in Rota solely to the appellee, Corbiniano Songao Ayuyu ("Corbiniano"), in accordance with a partida.

¶2     We have jurisdiction under title 1, § 3102(a) of the Commonwealth Code. We affirm.

## ISSUE AND STANDARD OF REVIEW

¶3     ■ Maria raises one[2] issue for our review: Whether the trial court erred in finding that a partida took place. This is a question of fact reviewable for clear error.[3]

## FACTUAL & PROCEDURAL BACKGROUND

### A. The Ayuyu Family

¶4     Juan M. Ayuyu and his wife, Isabel, lived on Rota and had seven children: Corbiniano, Jesus, Antonio, Calistro, Jose, Garabella, and Perpetua. Corbiniano was born in 1915.

¶5     ■ In April 1936, Perpetua gave birth to Maria. Six months later, Perpetua transferred the care and custody of Maria to her parents, Juan and Isabel. This arrangement is known in Chamorro as *poksai*, a custom involving the raising or nurturing of a child by an adult or adults other than the child's biological parents.[4]

¶6     Juan died in 1944, which left eight-year-old Maria under the care of Isabel who in turn was supported by Corbiniano until her death in 1962. Meanwhile, Maria attended school on Saipan from 1945 to 1950. She then returned to Rota and remained there for three years. In 1953, Maria married and moved permanently to Saipan.

### B. The Land

¶7     Juan and Isabel had property in Sakhaya, Santa Cruz, and allegedly in Tatachog.[5] Additionally, Isabel received land in Unginao from her family before she married Juan. She brought this land into her marriage. The present controversy concerns ownership only of the Unginao land.

¶8     The trial court found that, just prior to 1944, Juan and Isabel performed a partida. Antonio, Calistro and Jose all received portions of the Sakhaya land. The Santa Cruz property went to Jesus. The Ayuyus' biological daughters, Garabella and Perpetua, received no land. Under the partida, Juan and Isabel gave the Unginao land to Corbiniano.

¶9     Corbiniano has farmed the Unginao land for approximately fifty years. He used proceeds from the land to provide for Isabel from 1944 until her death eighteen years later. Within this period, in 1953, the Trust Territory administration issued T.D. 325, which states that the Unginao land "is the property of Isabel Songao Ayuyu." Excerpts R. at ___.[6] This is the first written record of ownership of the Unginao land.

¶10     During the nine years immediately following Juan's death, Isabel and Maria had a close relationship and, on several occasions, Isabel took Maria to the Unginao land while it was being farmed by Corbiniano. According to Maria, several times between 1942 and 1953,[7] Isabel told her that Isabel owned the Unginao land and that someday, it would belong to Maria. Corbiniano denies having any knowledge of these alleged statements. Maria did not discuss her claim to the Unginao land with Corbiniano until 1988, more than a quarter century after Isabel's death.

### C. The Probate Action

---

[1] *See Estate of Ayuyu*, 2 N.M.I. 243 (1991) ("*Estate of Ayuyu I*").

[2] Maria purports to present two issues, each of which contains two sub-parts. The sub-issues, however, all pertain to the main issue set forth above.

[3] *See Castro v. Castro.* 2 N.M.I. 334, 340-41 (1991) (dictum) (discussing evidence considered by trial court in making ultimate finding of no partida).

[4] Chamorro-English Dictionary 170 (1975).

[5] Corbiniano apparently owns the Tatachog land. He claims that he purchased it prior to 1944 from one Santiago Mendiola. Maria asserts, but offered no proof other than her own testimony, that Juan gave the Tatachog land to Corbiniano as his share of the Ayuyu family land. The trial court found "this portion of Maria's testimony inherently untrustworthy," *Estate of Ayuyu*, Civ. Action No. 89-863 (N.M.I. Super. Ct. May 11, 1994) (decision on remand at 12), and that it had "received no credible evidence indicating that the Ayuyu family *owned* [the] Tatachog property at the time Juan performed the partida." *Id.* (emphasis in original).

[6] Maria's counsel failed to paginate, tab or index the Excerpts of Record as required by Com. R. App. P. 30(e).

[7] As already noted. Maria lived on Saipan from 1945 to 1950.

¶11 In 1989, Corbiniano filed a petition for letters of administration and was appointed administrator of Isabel's estate, which consists only of the Unginao property. Maria filed a claim to the entire estate, asserting that Isabel told her that the Unginao land would be hers. Corbiniano disputed this claim, maintaining that his parents had given each of his brothers a parcel of land and gave the Unginao land to him.

¶12 In its first decision, the trial court found both parties' allegations to be factually correct, but did not specifically find that Juan and Isabel performed a partida. The court decided that Corbiniano should have two-thirds of Unginao and Maria should have one-third, reasoning that:

> Corbiniano S. Ayuyu is the natural child of [Isabel] and he cared for [her] until she passed away. He was the only child who took care and protected the land. It has been said that '[t]he adopted child's share may not equal those of the foster parents' own children . . .' It is only fair and equitable that [Corbiniano] receive more than [Maria]."[8]

Corbiniano appealed to this Court. We remanded after deciding that we could not address the merits until the trial court made additional, specific findings of fact.[9]

¶13 On remand, the trial court gave each party an opportunity to request a new or supplemental evidentiary hearing, or to submit the matter for decision based on the evidence already in the record. Both parties chose to submit the matter on the record without any further

hearing.[10]

¶14 The trial court then ordered the parties to file briefs, which could be supplemented with declarations, other evidentiary exhibits, and live testimony if desired, on two questions: (1) when and under what circumstances did Isabel first acquire the Unginao land; and (2) was the Unginao land part of the Ayuyu family estate prior to the death of Juan (Isabel's husband)?[11]

¶15 The parties submitted briefs but nothing more. In her brief, Maria advanced a new argument: that the Unginao land did not become a part of the Ayuyu estate until the Trust Territory government issued T.D. 325 in 1958. In light of this new contention and the lack of evidence in the record of the circumstances surrounding the issuance of T.D. 325, the trial court ordered Maria to "provide complete documentation of the proceedings leading up to" the issuance of T.D. 325. In this order, the trial court also gave Maria an opportunity to file a memorandum of law about the administrative res judicata effect of T.D. 325.[12] Maria never responded to the court's order.

¶16 The trial court proceeded to render its decision on remand. The court found it necessary to address only three issues: (1) whether Corbiniano's parents performed a partida; (2) if so, whether they designated the Unginao land as Corbiniano's; and (3) whether Isabel held an interest in the Unginao land, and if so, what that interest was. Based on the record as supplemented on remand, the trial court found that Isabel had owned Unginao as her separate property prior to marrying Juan. She brought the land into her marriage, at which point it became part of the Ayuyu marital estate. Juan subsequently performed a partida, with Isabel's consent, pursuant to which the Unginao land went to Corbiniano. The court concluded that T.D. 325 simply reflected Isabel's interest in Unginao between the time of the partida and her death, and that fee simple title to the land vested in Corbiniano when Isabel died. Maria timely appealed.

## ANALYSIS

### Performance of a Partida

¶17 ■ As noted above, in reviewing whether the trial

---

[8] *Estate of Ayuyu*, Civ. Action No. 90-863 (N.M.I. Super. Ct. Nov. 8, 1990) (Decision and Order at 3), *remanded*, 2 N.M.I. 243 (1991), *appeal after remand pending*, No. 94-032 (N.M.I. filed Aug. 1, 1994).

[9] *Estate of Ayuyu I, supra*, 2 N.M.I. at 247. We requested findings on the following questions:
1. Whether Corbiniano's parents performed a partida. If so, whether the Unginao land was made a part of the partida.
2. Whether there is a reason that Corbiniano did not receive land at the time that his siblings did, and what that reason is.
3. Whether, after a partida is made and possession of the land is retained in the parents, the parents can give that land, or part of it, to a child subsequently adopted by them. If so, then how does that affect the partida.
4. Whether the parcels of land received by the other siblings were unconditional gifts, inter-vivos transfers, or advancements.
5. Whether the siblings who received land previously are barred from receiving any share of Isabel's estate.
*Id.*

[10] *Estate of Ayuyu*, Civ. Action No. 89-863 (N.M.I. Super. Ct. filed Feb. 18, 1994) (order at 1), *on remand from* 2 N.M.I. 243 (1991).

[11] *Estate of Ayuyu*, Civ. Action No. 89-863 (N.M.I. Super. Ct. filed Feb. 18, 1994) (order at 2), *on remand from* 2 N.M.I. 243 (1991).

[12] *Estate of Ayuyu*, Civ. Action No. 89-863 (N.M.I. Super. Ct. filed Apr. 4, 1994) (order at 2), *on remand from* 2 N.M.I. 243 (1991).

court erred in finding that a partida was performed, we look for clear error. Absent clear error, we will not disturb the trial court's finding.[13] We will make a determination of clear error only if, after reviewing all the evidence, we are left with a firm and definite conviction that a mistake has been made.[14]

¶18 In support of her assertion that the trial court erred in making a finding of partida, Maria advances three arguments: first, that the Unginao land could not have been distributed through the alleged partida, because this land was Isabel's separate property; second, that the record contains insufficient evidence to support a finding of partida; and third, that T.D. 325, which lists Isabel as owner of the Unginao land, should be given res judicata effect. We will consider each of these arguments in turn.

### A. Status of the Unginao Land as Marital or Separate Property

¶19 Maria contends that the Unginao land was originally Isabel's separate property and, pursuant to Chamorro custom, it remained her separate property during her marriage to Juan.

¶20 ■ It is correct that, under Chamorro custom, separate property brought into a marriage by one spouse remains that spouse's separate property during the marriage.[15] However, this does not mean, as Maria suggests, that the Unginao land could not be distributed as part of the alleged partida.

¶21 ■ Normally, all land, including the wife's, is distributed during a partida.[16] Here, Corbiniano testified that his father *and* mother gave him the Unginao land in the partida. Tr. at 108, 121. Thus, Maria's assertion that Isabel held the Unginao land as her sole and separate property is relevant only in the context of the time prior to the partida. She parted with her ownership interest upon the performance of the partida.

### B. Evidence of Partida

¶22 Maria next asserts that Corbiniano "failed to present any factual basis for his assertion that the property was given to him by partida." Appellant's Br. at 8. Maria further charges that Corbiniano's testimony was inconsistent, self-serving, and uncorroborated by any other witness. Finally, Maria argues that Corbiniano's testimony should have been completely disregarded by the trial court because he, as administrator of Isabel's estate, was incompetent to testify. These contentions, to the extent we will consider them, are meritless.

¶23 ■ Maria failed to make any objection to Corbiniano's capacity to testify during the proceedings below. Consequently, we will not entertain her present challenge to the admissibility of his testimony.

¶24 Although the trial court expressly recognized that Corbiniano's testimony was self-serving, it noted that some of Maria's witnesses corroborated his testimony about the partida, and none of them contradicted it.[17] Corbiniano explicitly recalled where the partida took place. Consistent with a partida, the father (Juan), along with his wife (Isabel), called all of the children together. The sons, Antonio, Calistro, Jose and Jesus, received land. The two daughters, Garabella and Perpetua, received no land. As further discussed in section B, *infra*, possession and control over some of the land (Unginao) was retained for the support and maintenance of at least one parent (Isabel) during her lifetime, after which the recipient under the partida (Corbiniano) took it over completely.

¶25 The trial court fulfilled its obligation of considering and weighing all of the evidence presented by the parties, including various witnesses' testimony. This testimony, as weighted by the trial court and viewed in combination with the other evidence in the record, constitutes sufficient proof that a partida occurred.

### C. Legal Effect of T.D. 325

¶26 Maria's final contention is that the trial court erred by not giving res judicata effect to T.D. 325. In support of this argument, she points out that T.D. 325 lists Isabel as owner of the Unginao land, makes no reference to a partida having been made by Juan, and went unchallenged at the time of its issuance. Therefore, Maria maintains, based on this document, the trial court should have concluded that Isabel owned the Unginao land in fee simple absolute. We are not persuaded.

¶27 ■ Isabel, her husband, and their children were Chamorro. Isabel died prior to the enactment of the Commonwealth probate code, and evidence presented to the trial court indicated that the land in question was distributed pursuant to a partida. Therefore, the trial court looked behind T.D. 325 to determine the nature of the estate or interest in land held by Isabel. This was not error, but rather the appropriate path of analysis to follow

---

[13] Com. R. Civ. P. 52(a).

[14] *Pangelinan v. Itaman*, 4 N.M.I. 114, 120 n.33 (1994).

[15] *Estate of Dela Cruz*, 2 N.M.I. 1, 13-14 (1991).

[16] *Blas v. Blas*, 3 T.T.R. 99, 108-09 (T.T. High Ct., Tr. Div. 1966).

[17] *Estate of Ayuyu*, *supra*, decision on remand at 8-9.

based on the authority of cases such as *Blas, supra*,[18] and *Estate of Kaipat*.[19]

¶28 ■ The trial court found that, although Corbiniano received Unginao under the partida, Isabel retained formal control over this land until her death. There is no evidence that the Land Title officer knew of the partida when he issued T.D. 325. The issuance of T.D. 325 therefore did not negate or invalidate the partida. Rather, the T.D. was subject to the partida. The legal effect of T.D. 325 was simply to recognize Isabel's interest in the land at the time T.D. 325 was issued. The record supports these rulings.

¶29 ■ As previously discussed in Analysis section A, *supra*, under Chamorro customary law, parents may retain possession of and control over land that they have distributed by partida. Upon the death of the parent or parents, sole possession and control transfers automatically to the child designated to receive that land.[20]

¶30 The record indicates that the sequence of land tenure in the present case is consistent with the traditional Chamorro practice described above: Isabel retained an interest in, although not formal ownership of, the Unginao land until her death. Corbiniano farmed the parcel and used the proceeds to support Isabel during this time. When Isabel died, Corbiniano retained possession and continued to "farm and protect" the land. Meanwhile, Maria made absolutely no attempt to claim ownership of the Unginao land, notwithstanding the fact that Corbiniano continued to farm it after Isabel died, until Isabel's estate was probated more than twenty-five years after her death.[21] Thus, even Maria's conduct may be viewed as consistent with a belief that Corbiniano, and not she, owned the land.

¶31 The trial court did not err in looking behind T.D. 325 and concluding that Corbiniano received the Unginao land as his own at the time of the partida, subject only to his

mother's right, under Chamorro custom, to retain possession of and formal control over the land and its proceeds until her death.

¶32 Our review of all the evidence in the record does not leave us with a firm and definite conviction that a mistake has been made. We hold, therefore, that the trial court did not commit clear error in finding that a partida was performed, and that under the partida, Corbiniano received the Unginao land.

## PROSECUTION OF THIS APPEAL

¶33 ■ Due to the poor quality of appellate advocacy on the part of Maria's counsel, and in order to impress upon him the importance of paying attention to the appellate rules, the Court has decided to take the unusual step of publicly admonishing counsel and issuing an order to show cause why a sanction in the amount of $200.00 should not be imposed. As grounds for this action, the Court notes, among other things, that counsel: (1) filed five motions for extensions of time in which to file his opening brief, none of which complied fully with the requirements of Commonwealth Rule of Appellate Procedure 31(d)[22] ("Com. R. App. P."); (2) incorrectly cited the statutory bases of the Superior Court's and this Court's jurisdiction in this matter; (3) failed to comply with Com. R. App. P. 30(e)'s requirement that the excerpts of record be numbered, tabbed or paginated; (4) neglected to distinguish in his citations between the transcripts of two different Superior Court proceedings, and cited transcript pages which do not appear at all in the excerpts of record,[23] in contravention of Com. R. App. P. 28(e) and 30(c)(1); and (5) cited cases for propositions for which they do not stand. Needless to say, the cumulative effect of counsel's pervasive failure to comply with the rules of this Court, as well as the lack of candor toward this tribunal which counsel's conduct reflects, have greatly impeded our ability efficiently to process this appeal.

¶34 As detailed in the Analysis section, *infra*, we have also found counsel's arguments on appeal to be seriously[24]

---

[18] 3 T.T.R. at 109 ("In view of the uncertainties of land concepts on Saipan when turned into American terms, the court is of the opinion that the deceased's statement [to the Mariana District Land Title Officer] that he was claiming as 'sole owner' did not deny [his child's] possible interest . . . .").

[19] 3 N.M.I. 494, 497-98 (reiterating principle set forth in *Estate of Dela Cruz, supra*, that "although a land title determination should be accorded finality under the principle of administrative res judicata, the trial court may still determine issues left unanswered by the title determination").

[20] *Estate of Seman*, 4 N.M.I. 129, 132 n.12 (1994) (citation omitted); *Blas, supra*, 3 T.T.R. at 109.

[21] *Estate of Ogumoro*, 4 N.M.I. 124, 127 (1994) (observing that claimants' past conduct was inconsistent with later assertion of ownership of land during probate proceeding).

[22] For instance, after his second request for an extension, counsel stopped including information in his motions as to how many prior requests for extensions he had made.

[23] *See* Br. for Appellant at 9, ¶ 1 (arguing insufficiency of evidence).

[24] As noted above, we agree with Maria that the trial court erred in concluding that the Unginao land became part of the Ayuyu "family estate" when she married Juan. However, this point has no bearing on the result here, because the Unginao land became subject to distribution by partida after Isabel married, even though the land remained her separate property. *See* Analysis section I, *supra*.

lacking in merit. With respect to each issue he presents, counsel in effect urges us to second guess the trial court's findings based on conflicting testimony, and asserts that the trial court improperly considered evidence the admission of which counsel never objected to below.

¶35 Having observed similar conduct in the prosecution of other appeals[25] before this Court, and good cause appearing, our Opinion and Judgment in the instant case shall include an Order to Show Cause why a sanction of $200.00 should not be imposed, under Com. R. App. P. 38, on Maria's counsel[26] for bringing a frivolous appeal and failing substantially to comply with the rules of this Court.

## CONCLUSION

¶36 For the reasons set forth above, we hereby **AFFIRM** the Superior Court's judgment in favor of Corbiniano. Counsel for Maria is hereby **ORDERED** to show cause within fourteen (14) days of the filing of this Opinion, why he should not be sanctioned to pay $200.00 under Com. R. App. R. 38.

---

[25] While noting this, we wish to make clear that the sanctions proposed here are for counsel's conduct only in the present case, and not for his conduct in prior or other pending appeals.

[26] As Maria herself is not to blame for the deficiencies in her attorney's performance, the contemplated sanction. if imposed, shall apply only to counsel and not to his client. Maria.